**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| YVONNE PINKSTON, as guardian of the estate of K.S., a minor child, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19-cv-6477 |
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, CYNTHIA MILLER, MAURICE POLK, and PAMELA SMITH, | ) ) ) ) | Honorable Judge John J. Tharp, Jr. |
| Defendants. | ) ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiffs, by and through their attorneys, THE HERBERT LAW FIRM, complains of

Defendants, THE BOARD OF EDUCATION OF THE CITY OF CHICAGO ("Board"),

CYNTHIA MILLER ("Mrs. Miller"), MAURICE POLK ("Mr. Polk"), and PAMELA SMITH

(Mrs. Smith"), and states as follows:

**JURISDICTION AND VENUE**

1.      This case is brought under 42 U.S.C. § 1983 to redress the deprivation under color

of law of Plaintiff's rights as secured by the United States and Illinois Constitutions, under the

Illinois Civil Rights Act, 740 ILCS § 23/5, et seq. and under Illinois law, to redress the

harassment, hostile educational environment and abuse against K.S., a minor child.

2.      This Court has jurisdiction of the action under 28 U.S.C. §§ 1331 and 1367.

Venue is proper under 28 U.S.C. § 1391(b).

3.      The parties reside in this judicial district, and the events giving rise to the claims

all occurred within this district.

## FACTS

4.      Plaintiff, Yvonne Pinkston is the mother of the minor child, K.S, a nine-year-old boy.

5.      Plaintiff, minor child, K.S., an African-American male began as a new fourth-grade student at Fiske Elementary IB World School in the fall of 2018.

6.      Fiske Elementary IB World School ("Fiske") is part of Chicago Public Schools ("CPS") and managed, supervised and governed by the Defendant, the Board of Education of the City of Chicago ("Board").

7.      Fiske is located at 6020 South Langley Avenue on the south side of Chicago, in the Englewood neighborhood, a predominantly impoverished and high-crime community.

8.      The Board, founded in 1840, is responsible for the governance, organizational and financial oversight of CPS, the third largest school district in the United States of America.  It establishes policies, standards, goals and initiatives to ensure accountability and provide a high-quality, world-class education for the 21st century that prepares students for success in college, work and life.

9.      At all relevant times, Mrs. Miller was the principal of Fiske, an employee and an agent of Defendant Board.

10.      At all relevant times, Mr. Polk was the school security officer of Fiske, an employee and an agent of Defendant Board.

11.      At all relevant times, Mrs. Smith was the school counselor of Fiske, an employee and an agent of Defendant Board.

12.      K.S. transferred to Fiske from a public school in Lafayette, Indiana, where he attended first, second and third grade.

13.    While in attendance at the Lafayette public schools, K.S. received no discipline and excelled in his academics.

14.    CPS' Student Bill of Rights specifically states, "Every student has rights. . . freedom from physical (corporal) punishment, verbal abuse, unfair searches (meaning without cause or reason), or any unusual form of punishment.  District employees should not inflict any type of corporal punishment on any student."

15.    Since K.S.'s enrollment at Fiske, other students bullied and harassed him; K.S., his mother and grandparents, on numerous occasions since his enrollment at Fiske, complained to the school administrators but they failed to take any action to protect K.S. and even became abusive towards him.

16.    Each time K.S. complained of being bullied and harassed by his fellow students, the school administrators refused to take action against the harassing students and made K.S. sit in the office rather than in his classroom as punishment.

17.    On March 26, 2019, K.S. and another student engaged in an argument; the other student struck K.S. and K.S. struck him back.

18.    K.S. and the other student were sent to speak with one of the counselors.

19.    K.S. communicated his side of the story to the counselor and denied being the aggressor.

20.    The counselor spoke with other students the school refers to as "Safe and Responsible Students" and said students advised the counselor inaccurately that K.S. was the aggressor.

21.    The other involved student was sent back to class and K.S. was kept in the office.

22.    K.S. walked out of the counselor's office and leaned up against the wall in the

4861-2238-9762, v. 1

hallway, hanging his head.

23.     Mr. Polk came up to K.S. and grabbed him by the wrists, leaning over him and speaking aggressively in his face, all the while K.S. hung his head and did not respond.

24.     While Mr. Polk physically constrained K.S., K.S. overheard Mrs. Miller on the walkie talkie say "bring him to my office."

25.     Mr. Polk yanked K.S. into Mrs. Miller's office.

26.     While in the office, Mrs. Miller shouted at K.S. and told him that she was going to "put him outside."

27.     When K.S. did not respond, Mrs. Miller had Mr. Polk drag K.S. towards the outside doors of Fiske and shove him towards the door.

28.     Mrs. Miller and Mrs. Smith watched Mr. Polk push K.S. outside into the cold all alone.

29.     Mr. Polk, Mrs. Miller and Mrs. Smith created a barrier as to not allow K.S. to remain in the school building.

30.     On March 26, 2019 in Chicago, the high temperature for the day was 46 degrees Fahrenheit and the low temperature was 27 degrees Fahrenheit.

31.     Outside all alone in the cold, K.S. was in a short sleeve polo shirt and khaki pants.

32.     K.S. attempted to enter the building at other doorways, which were all locked.

33.     When K.S. could not get back inside the building, he began crying and looking for somewhere to stay out of harm's way.

34.     A few minutes later and while K.S. was outside in the cold, a Fiske employee called 911 and reported a missing student.  See CPD Event Query dated March 26, 2019 attached hereto as Exhibit "A".

35. The Fiske school employee reported that K.S. "walked out of the school" and indicated that they needed a police report. *Id.*

36. Approximately, a half-hour later, a Fiske school employee called 911 again, this time requesting an ambulance and falsely reporting that K.S. fought everyone and was kicking, biting and scratching. *Id.*

37. While on the call with 911 the second time, the Chicago Police Department ("CPD") Officer arrived at the school.

38. K.S. remained out in the cold all alone for approximately a half-hour.

39. Upon the CPD officer's arrival, K.S. was outside Fiske sitting on the playground; he was crying, cold, and terrified.

40. The CPD officer brought K.S. into the school's main office with her.

41. While in the office, K.S. overheard Mrs. Miller telling the CPD officer that K.S. ran out of the building.

42. K.S. remained in the school office and sat there quietly until his grandfather arrived to pick him up.

43. Upon K.S.'s grandfather's arrival, Mrs. Miller told his grandfather that K.S. ran out of the school.

44. Specifically caught on CPD body-worn camera footage, Mrs. Miller falsely stated to K.S.'s grandfather that K.S. "pulled his fists back like he was going to hit me because he wanted to leave this office and wanted to run around the building so that we could chase him." Mrs. Miller further stated, as shown on the CPD body-worn camera footage that K.S. "screamed and said 'I don't want to be here, don't put your hands on me, if you put your hands on me I'm going to kick you, I'm going to punch you, I'm going to hurt you and then decided to leave the

building because I told him if you can't calm yourself down I'm going to have to call the police

and then he said I don't want to be here and bust through us and went out the door."

47. 45.   The CPD body-worn camera footage from March 26, 2019 coupled with the

security video footage from the same day does not depict the events anywhere near close to Mrs.

Miller's account provided to K.S.'s grandfather on that date when he arrived to pick up K.S.

46.   Mrs. Miller blatantly gave a false account of events to K.S.'s grandfather, in front

of K.S.; the CPD body-worn camera shows K.S.'s discontent with Mrs. Miller's false version of

the events as she is spewing them to K.S.'s grandfather.

47.   Mrs. Miller's false reporting of the March 26, 2019 events to K.S.'s grandfather

show complete and utter disregard for K.S.'s emotional well-being.

48.   On April 25, 2019, K.S. continued to be harassed by fellow students.

49.   When K.S. complained of the harassment to the school. Clerk Searcy called 911.

50.   Clerk Searcy was an administrative assistant, an employee of Fiske and an agent

for the Defendant Board.

51.   In response to K.S.'s complaints, Clerk Searcy called 911 and falsely reported

that K.S. was "being violent or harmful to himself" and falsely referred to K.S. as a "disturbed

mental."  See CPD Event Query dated April 25, 2019 attached hereto as Exhibit "B".

52.   At the time the caller alleged K.S. to be a disturbed mental, Fiske was fully aware

that K.S. had been psychologically tested and found to have no known mental deficiencies.

53.   In and around April 2019, K.S. was forced to transfer to another school within

CPS as a result of the continued harassment.

54.   In and around August 2019, K.S. enrolled in a charter school and is doing well

academically and without any abuse or harassment by either fellow students or school

6

administrators.

55.     However, K.S.'s experience at Fiske has left him with lasting, emotional wounds.

56.     K.S. sees a psychologist weekly to help him overcome the trauma he endured at the hands of the school administrators at Fiske.

57.     The Board of Education of the City of Chicago has a history of employing teachers and/or administrators without doing extensive background checks to ensure the safety of all the children attending CPS schools.

58.     In 2016, a guardian sued the Board after her 9-year-old son was dragged by his clothes down stairs and to the principal's office by his teacher; this occurred on the city's South Side.

59.     In 2018, another lawsuit brought against the Board alleged that a CPS school assistant physically abused students at least seven (7) times.

60.     In 2018, the Chicago Tribune wrote a multi-part series "Betrayed" detailing how CPS used ineffective employee background checks, failed to alert authorities about sexual misconduct allegations and inflicted "psychological pain" on victims across hundreds of cases of abuse.

61.     The same Chicago Tribune series detailed systemic issues within the school district, which failed to correct "obvious child-protection mistakes" and allowed hundreds of students to become victims of abuse by CPS employees over the past decade.

62.     Additionally, "[i]neffective background checks exposed students to educators with criminal convictions and arrests for sex crimes against children. And CPS failed to disclose to other districts that past employees had resigned after investigators found credible evidence of abuse and harassment."

63.     In 2019, a mother filed a lawsuit against the Board alleging that her son's suicide attempt could have been prevented if CPS officials hadn't ignored her pleas to protect her son from bullying and physical abuse by CPS staff members and fellow students; CPS settled this lawsuit for $1.25 million approximately two (2) years after the student's attempted suicide and after he died from health complications stemming from his suicide attempt.

**COUNT I**
**42 U.S.C. § 1983 – EQUAL PROTECTION**
**Against Defendants Miller, Polk and Smith**

64.     Plaintiff realleges and incorporates paragraph 1 through 63 above as if stated herein.

65.     As described above, employees, Miller, Polk and Smith of the Defendant Board harassed, abused and discriminated against Plaintiff, K.S. and the Board failed to take any action to protect K.S.

66.     Plaintiff, K.S. has been victimized and treated differently than other similarly situated students and the treatment was intentional and had no rational basis; Defendants failed to protect K.S. and provide him a safe educational environment.

67.     The differential treatment Plaintiff, K.S. received and described in the preceding paragraphs was intentional and arbitrary, motivated by nefarious and discriminatory purpose, and was not rationally-related to any governmental interest.

68.     The misconduct described in this Count was undertaken by the individual defendants, especially Defendant Miller, who, as the Principal of Fiske, possessed the final authority to establish policy with respect to procedures for its agents and employees to follow when faced with the circumstances as described in the preceding paragraphs.

69.     The misconduct described in this Count was undertaken with malice, willfulness,

8

and reckless indifference to the rights of K.S.

70.     As a result of the above-described wrongful conduct, Plaintiff, K.S. has suffered

damages, including but not limited to, emotional and mental stress and anguish.

**COUNT II**
**42 U.S.C. § 1983 – UNREASONABLE SEIZURE**
**Defendant Maurice Polk**

71.     Plaintiff realleges and incorporates paragraphs 1 through 70 above as if stated

herein.

72.     Mr. Polk, an employee and agent of the Board, acted under the color of law when,

with reckless indifference when he deprived Plaintiff of his constitutional due process rights and

his rights under the Fifth and Fourteenth Amendments of the United States Constitution.

73.     Plaintiff was seized and forcefully pulled into Mrs. Miller's office by Mr. Polk

despite the fact that Plaintiff presented no harm or threat of harm to said parties or any other

individual at the time of the incident.

74.     Mr. Polk's actions unlawfully restrained Plaintiff's freedom of movement, by

forcefully yanking Plaintiff into Mrs. Miller's office.

75.     Mr. Polk's actions as set forth above were undertaken intentionally, with malice

and reckless indifference to Plaintiff's rights.

76.     The aforementioned conduct was undertaken pursuant to practices and policies,

both informal and formal, of Defendant Board.

77.     As a result of Mr. Polk's actions, Plaintiff suffered severe emotional damage,

distress and mental anguish.

## COUNT III
## 42 U.S.C. § 1983 – EXCESSIVE FORCE
### Defendant Maurice Polk

78.     Plaintiff realleges and incorporates paragraphs 1 through 77 above as if stated herein.

79.     Mr. Polk, an employee and agent of the Board, acted under the color of law when, with reckless indifference when he deprived Plaintiff of his constitutional due process rights and his rights under the Fifth and Fourteenth Amendments of the United States Constitution.

80.     On March 26, 2019, Mr. Polk aggressively grabbed, dragged and shoved Plaintiff outside of Fiske and directly into harm's way, even though Plaintiff posed no harm or threat of harm to said parties or any other individuals at the time of the incident.

81.     Mr. Polk forced Plaintiff outside the doors of Fiske, despite K.S.'s plea to remain in school.

82.     Mr. Polk's actions as set forth above were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights, such to shock the conscience.

83.     Due to Mr. Polk's actions, Plaintiff suffered severe emotional damage, distress and mental anguish.

## COUNT IV
## 42 U.S.C. § 1983 - *MONELL* CLAIM

84.     Plaintiff realleges and incorporates paragraphs 1 through 83 above as if stated herein.

85.     Defendant Board failed to hire employees with clean background records absent from convictions and arrests related to crimes against children.

86.     Defendant Board failed to implement policies that required Board employees to

10

report misconduct, or suspicion of misconduct to the authorities and/or the Illinois Department of Children & Family Services.

87.     Defendant Board failed to investigate claims of harassment and/or abuse by its agents to ensure CPS students were not subjected to psychological pain by its employees.

88.     Defendants' agents, Mrs. Miller, Mr. Polk and Mrs. Smith were "state actors" working for the Board, a federally funded school system.

89.     Defendants, through their agents, acted under "color of law" when subjecting Plaintiff, K.S. to assault, battery, abuse and harassment on school premises.

90.     Defendants, through their agents, failed to preserve Plaintiff's constitutional right to equal protection as guaranteed by the Fourteenth Amendment.

91.     Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff had the right to equal access to an educational environment free from abuse, harassment and discrimination.

92.     Defendants' agents knew or should have known that their actions taken against Plaintiff, K.S. violated federal law.

93.     Defendant and its agents each violated Plaintiff's right to equal access by:

    a)  Failing to conduct effective background checks for all CPS employees to ensure no employees had criminal convictions and/or arrests for crimes against children;

    b)  Failing to alert authorities about misconduct allegations and/or the Illinois Department of Children & Family Services to report suspicions of misconduct by Board employees;

    c)  Failing to establish the necessary procedures to adequately train school

employees;

d) Failing to follow established policies in place to protect students from harm and to promote a meaningful learning environment;

e) Failing to establish anti-bullying and harassment policies and otherwise failing to provide a safe and appropriate educational environment; and,

f) Failing to take effective affirmative steps to provide for the education, safety and well-being of all of the school's students.

94. Defendants violated Plaintiff's Fourteenth Amendment right to equal protection by treating him differently than the other students, allowing the Defendants' agents to treat K.S. differently, specifically in the form of harassment, abuse, and neglect.

95. Defendants' actions were the proximate cause of Plaintiff's emotional distress and psychological damage, and his character and standing in his community have suffered from the harassment fostered as a result of Defendants' deliberate indifference to his right to equal protection under the Fourteenth Amendment.

**COUNT V**
**STATE LAW CLAIM – ILLINOIS CIVIL RIGHTS ACT**
**740 ILCS § 23/5(c)(2)**

96. Plaintiff realleges and incorporates paragraphs 1 through 95 above as if stated herein.

97. The misconduct described above is a violation of K.S.'s rights as secured by the Illinois Constitution.

98. Specifically, Defendants' agents acted with deliberate indifference to K.S.'s rights to equal protection of the law.

99. The misconduct described above was undertaken with malice, willfulness, and

12

reckless indifference to the rights of K.S.

100.    As a result of these deprivations, K.S.'s rights, as secured by the Illinois

Constitution, suffered damages.

## COUNT VI
## STATE LAW BATTERY
### Defendant Maurice Polk

101.    Plaintiff realleges and incorporates paragraphs 1 through 100 above as if stated

herein.

102.    On March 26, 2019, Mr. Polk intentionally made non-consensual physical contact

with Plaintiff's person.

103.    Said contact was in the form of pushing, pulling, dragging and shoving Plaintiff

out the doors of Fiske school.

104.    Mr. Polk's actions toward Plaintiff caused severe emotional distress and mental

anguish to Plaintiff.

## COUNT VII
## STATE LAW ASSAULT
### Defendant Maurice Polk

105.    Plaintiff realleges and incorporates paragraphs 1 through 104 above as if stated

herein.

106.    On March 26, 2019, Mr. Polk approached K.S. in a threatening manner.

107.    Said conduct caused K.S. apprehension of immediate offensive conduct to his

person.

108.    Given Mr. Polk's position, height and stature holding Plaintiff's arms and wrists,

K.S. had reasonable belief that Mr. Polk could, and would, make the threatened offensive contact

to his person.

109.     As a result of Mr. Polk's conduct, K.S. suffered severe emotional distress, damages and mental anguish.

## COUNT VIII
## STATE LAW ASSAULT
### Defendant Cynthia Miller

110.     Plaintiff realleges and incorporates paragraphs 1 through 109 above as if stated herein.

111.     On March 26, 2019, Mrs. Miller approached K.S. in a threatening manner.

112.     Said conduct caused K.S. apprehension of immediate offensive conduct to his person.

113.     Given Mrs. Miller's physical position surrounding K.S., K.S. had reasonable belief that Mrs. Miller could, and would, make the threatened offensive contact to his person.

114.     As a result of Mrs. Miller's conduct, K.S. suffered severe emotional distress, damages and mental anguish.

## COUNT IX
## STATE LAW ASSAULT
### Defendant Pamela Smith

115.     Plaintiff realleges and incorporates paragraphs 1 through 114 above as if stated herein.

116.     On March 26, 2019, Mrs. Smith approached K.S. in a threatening manner.

117.     Said conduct caused K.S. apprehension of immediate offensive conduct to his person.

118.     Given Mrs. Smith's physical position surrounding K.S., K.S. had reasonable belief that Mrs. Smith could, and would, make the threatened offensive contact to his person.

119.     As a result of Mrs. Smith's conduct, K.S. suffered severe emotional distress,

damages and mental anguish.

## COUNT X – STATE LAW CLAIM
## WILLFUL AND WANTON RETENTION/FAILURE TO SUPERVISE

120.     Plaintiff realleges and incorporates paragraphs 1 through 119 above as if stated herein.

121.     At all relevant times, Defendants Miller, Polk and Smith displayed their inability to carry out their respective roles as employees of the Defendant Board; and, were all unfit to work directly with and be responsible for hundreds of CPS students on a daily basis.

122.     As a direct and proximate cause of Defendants Miller, Polk and Smith's unfitness, K.S. was harmed.

123.     At all relevant times, Defendant Board had the authority to terminate the employment of Defendants Miller, Polk and Smith.

124.     At all relevant times, Defendants had a duty to refrain from conduct that showed an utter indifference to, or conscious disregard for, the safety of others and, specifically, the students attending schools within CPS.

125.     Defendants breached their duty through each of the following non-exhaustive list of acts or omissions:

   a)   Failing to have in place policies and procedures for disciplinary action in regards to students;

   b)   Failing to comply with any policies or procedures for disciplinary action in regards to students;

   c)   Failing to investigate allegations of misconduct made by students and/or students' parents against the administrators and/or staff;

d)  Failing to educate or train employees on how to properly discipline students; and

e)  Continuing to allow an environment in which K.S. could be repeatedly subjected to abusive and harassing practices by administrators, staff, and fellow students.

126.    As a direct and proximate result of Defendants' utter indifference or conscious disregard for student safety and rights, as demonstrated by the lack of policies and procedures to prevent abusive and harassing practices by administrators and staff, K.S. was subjected to repeated instances of abuse on school property during school hours by administrators and staff, resulting in serious mental, emotional and economic injuries.

**COUNT XI – STATE LAW CLAIM**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Defendant Maurice Polk**

127.    Plaintiff realleges and incorporates paragraphs 1 through 126 above as if stated herein.

128.    As described fully in the preceding paragraphs, the Defendant, Mr. Maurice Polk engaged in extreme and outrageous conduct with respect to K.S.

129.    This misconduct was undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

130.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of K.S.

131.    As a proximate cause of this misconduct, K.S. suffered severe emotional distress and mental anguish.

4861-2238-9762, v. 1

## COUNT XII – STATE LAW CLAIM
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### Defendant Cynthia Miller

132.    Plaintiff realleges and incorporates paragraphs 1 through 131 above as if stated herein.

133.    As described fully in the preceding paragraphs, the Defendant, Mrs. Cynthia Miller engaged in extreme and outrageous conduct with respect to K.S.

134.    This misconduct was undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

135.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of K.S.

136.    As a proximate cause of this misconduct, K.S. suffered severe emotional distress and mental anguish.

## COUNT XIII – STATE LAW CLAIM
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### Defendant Pamela Smith

137.    Plaintiff realleges and incorporates paragraphs 1 through 136 above as if stated herein.

138.    As described fully in the preceding paragraphs, the Defendant, Mrs. Pamela Smith engaged in extreme and outrageous conduct with respect to K.S.

139.    This misconduct was undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

140.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of K.S.

141.    As a proximate cause of this misconduct, K.S. suffered severe emotional distress and mental anguish.

**COUNT XIV – STATE LAW CLAIM**
**BREACH OF FIDUCIARY DUTY**

142.    Plaintiff realleges and incorporates paragraphs 1 through 141 above as if stated herein.

143.    At all relevant times, K.S. was a student at Fiske Elementary IB World School, which is managed, supervised and governed by CPS.

144.    Defendants owed a fiduciary duty to K.S.

145.    As a student, K.S. placed a significant trust in his teachers, administrators and school staff to provide him with a safe learning environment free from threats of physical and mental abuse.

146.    As a student, K.S. placed a special confidence in the teachers, administrators and school staff to act in good faith and with due regard to K.S.'s interests.

147.    Defendants undertook to provide students, including K.S., a safe learning environment.  Defendants affirmatively recognized that it's a child's right to be safe at school. School staff, meanwhile, were required to intervene to prevent danger or harm to students, not perpetuate said harm or cause said harm.

148.    As a result of K.S.'s placement of trust and confidence in his school and his teachers and administrators to keep him safe during the school day, as well as the power and ability of school employees to prevent dangerous or harassing situations from arising, Defendants owed a fiduciary duty to K.S.

18

149.    Defendants breached said duty by each of the following non-exhaustive acts or omissions:

    a)  Failing to have proper policies in place to supervise Board's agents and employees to protect students from misconduct;

    b)  Failing to have proper reporting policies in place for students and/or students' parents to report acts of misconduct by school administrators and/or school staff;

    c)  Failure to intervene to prevent future misconduct upon learning of the incident involving K.S.;

    d)  Failure to undertake a reasonable investigation into K.S.'s repeated reports of misconduct by the school administrators and/or school staff;

    e)  Failing to take seriously K.S.'s complaints that he was subjected to misconduct by school administrators and school staff.

150.    As a direct and proximate cause of each of the aforementioned breaches by Defendants, K.S. was subjected to repeated physical and emotional abuse, harassment and misconduct during school hours on school property, resulting in serious and permanent mental anguish, emotional and economic injuries.

**COUNT XV – STATE LAW CLAIM**
**<u>FALSE IMPRISONMENT</u>**
**Defendant Maurice Polk**

151.    Plaintiff realleges and incorporates paragraph 1 through 150 above as if stated herein.

152.    Mr. Polk intentionally confined K.S. by forcibly yanking him into the office and refusing K.S. to leave.

19

153.    Mr. Polk's actions directly prevented K.S. from leaving the scene of the assault.

154.    Mr. Polk's actions directly caused K.S. to be confined in the office without the option to go back to class.

155.    Mr. Polk's actions in confining K.S. to the scene of the assault and in the office were intended to confine his freedom of movement and prevent K.S. from going back to class.

156.    Mr. Polk's conduct was intentional, malicious and outrageous, subjecting Mr. Polk to punitive damages.

## COUNT XVI – STATE LAW CLAIM
### RESPONDEAT SUPERIOR

157.    Plaintiff realleges and incorporates paragraphs 1 through 156 above as if stated herein.

158.    In committing the acts alleged in the preceding paragraphs, Defendants' agents, namely, Mr. Polk, Mrs. Miller and Mrs. Smith acted at all relevant times within the scope of their employment.

159.    Defendants, Board and City are liable as the principal for all torts committed by its agents.

## COUNT XVII – STATE LAW CLAIM
### INDEMNIFICATION

160.    Plaintiff realleges and incorporates paragraphs 1 through 159 above as if stated herein.

161.    In Illinois, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.  735 ILCS 10/9-102.

162.     Defendants' agents, namely Mr. Polk, Mrs. Miller and Mrs. Smith, were employees of the Defendants, Board and City and acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, awarding compensatory damages, punitive damages, attorneys' fees and any other relief this Court deems just and appropriate under the circumstances.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.


Dated:  November 2, 2021                    Respectfully submitted,

                                            /s/ Daniel Q. Herbert
                                            Daniel Q. Herbert (ARDC No. 6273940)
                                            The Herbert Law Firm
                                            206 S. Jefferson, Suite 100
                                            Chicago, IL 60661
                                            (312) 655-7660
                                            Dan.herbert@danherbertlaw.com

                                            /s/ Kelly A. Krauchun
                                            Kelly A. Krauchun (ARDC No. 6322639)
                                            The Herbert Law Firm
                                            206 S. Jefferson, Suite 100
                                            Chicago, IL 60661
                                            (312) 655-7660
                                            Kelly.krauchun@danherbertlaw.com

4861-2238-9762, v. 1

## <u>CERTIFICATE OF SERVICE</u>

       I, the undersigned, being first duly sworn upon oath, depose, and say that I caused to be served the foregoing document by electronically filing the same with the Clerk for the U.S. District Court for the Northern District of Illinois, Eastern Division, a copy of which was then forwarded to each attorney of record by CM/ECF on November 2, 2021.

RESPECTFULLY SUBMITTED,

Dated: November 2, 2021                      By:    /s/ Daniel Q. Herbert

                                          /s/ Kelly A. Krauchun

The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Dan.herbert@danherbertlaw.com
Kelly.krauchun@danherbertlaw.com